May it please the Court, my name is Bruce Locke, and I represent Mr. Rodriguez in this case. I also was the trial attorney in this case. You both were the trial attorneys, correct? That's correct. In 1993, Judge Kaczynski described the role of a prosecutor as first to be sure of the truth and justice first and win cases second. Judge Kaczynski quoted Justice Douglas, who said that a prosecutor's role is not to tack up skins on the wall, but to ensure that the defendant gets a fair trial. Well, I'm sort of interested from this standpoint, because a lot of this surrounds Mendez, the individual Mendez. And in reviewing the record, you wrote some somewhat, I don't know how to describe them, some pointed emails or communications with the prosecutor, telling him that, you know, some of the things that you were just saying and that, you know, if you put this witness on, you're unethical and the whole thing. And then later in the trial, after you've been claiming all of that, then you want a continuance to put this witness on and you are claiming, you know, that you're wanting us to reverse this case because you're not allowed to call the same witness that you earlier in the trial were telling the prosecutor that he was unethical if he did call him. That's correct. So I'm finding a little disconnect there. Well, in the first instance, the government was going to call him to say that he had purchased drugs from my client, Mr. Rodriguez, in the past. The government provided me with a memorandum of interviews, or no, they emailed me what Mendez was going to say about those past purchases. They then sent me another email saying, wait a minute, Mendez, we re-interviewed him and he doesn't say what we said the first time. Now he says something different. That caused me to write them and say you shouldn't put him on because he's clearly lying about buying drugs from my client. You said a little, you were a little stronger than that. You basically said Mendez is, in effect, a known scumbag liar. He's a terrible liar. If you put him on, you'd be violating all your ethical duties unless he wants to say something nice about us that helps us, in which case he's not a terrible liar anymore. Correct? Right. That is exactly the point. But the point is, Judge, that the reason he was saying he bought drugs from my client is to get half off of his sentence. No, the point really is that one should not act like one's taking the high road. It's good to take the legal road, but say, you folks are just immoral, immoral people if you do anything with this witness, but if I do it, it's perfectly moral. You know, so it's not so good to open that conversation with that particular pat on the back. Okay? Well. There's another point to make. Let's make it. Yeah, the point is that a witness can be lying about one thing when it's in his interest to be lying about it, which was Mendez making up the story about buying drugs from my client and then not even being able to keep the story straight when he's talking to the prosecutors. But if he thinks he might be getting some benefit out of switching himself around when declarations are made, if he thinks, as he told his wife, gosh, if I see something different, I'm going to get some benefits out of it, that's different, right? The discussion of signing, but they said they'd get me something really good if I'd only sign this declaration. Judge, that's a husband talking to his wife. The wife said, you shouldn't assign the declaration, you're going to get yourself in trouble, and he's saying, oh, don't worry about it, I can always say I didn't understand it. He said, he says, I didn't understand it. He says, I didn't understand it. I didn't understand it. He said, don't worry, I can always lie about it. He said, I didn't understand it, he told his wife. But that's okay, right? I mean, if he's going to switch around like that, then he's okay as a witness. It's good, it's okay to call him. It's not unethical for you to want to call him as a witness in that case, correct? Correct. Okay. I just want to make sure we've got it clear. Well, it gets a little more complicated than that, too, because later, the prosecutor decides not to call Mendez, and then you say, well, you say that the prosecutor essentially had a duty to hold on to Mendez for your benefit, although you never subpoenaed Mendez, and then you're claiming error here that you weren't given a continuance. But the backdrop of all of that is that Mendez had a lawyer. Mendez's lawyer, it seems to have been known to people that Mendez's lawyer had indicated that he would talk to you, but that his client was going to claim the fifth. And last I checked, you cannot call a witness in court when you know they're going to claim the fifth, put them up on the witness stand, ask them a question in front of the jury, and have them claim the fifth. So the basis of your continuance is that you could have subpoenaed this person, you didn't subpoena this person. It was, therefore, somehow the prosecutor's fault that they didn't call this witness, even though you had told the prosecutor at the beginning that he was an unethical individual for even thinking about calling the prosecutor. And then you don't contact the lawyer, you don't send anyone out to interview Mendez, and the information appears to be that Mendez is going to claim the fifth. So the judge says, I'm not going to send these jurors home for a day only to come back knowing that this witness is going to claim the fifth. There isn't going to be any more testimony. You haven't shown due diligence. So why did the district court get that wrong? Okay, first, there is no indication that Mendez, that the lawyer was going to let me talk to Mendez. In fact, after the trial, I wrote the lawyer a letter asking to interview Mendez at that time, and I got no response. The situation at the time of trial was that Mendez had a cooperation agreement with the government that was going to get him half off his sentence. No defense attorney in the world is going to allow another defense attorney to talk to the witness. Well, did Mendez have a Fifth Amendment right? I don't think he had a Fifth Amendment right at that point. He already pled guilty to the crime. No, but he's not sentenced, his appeals aren't done, any of that. I mean, he pled, there's no appeal. He's not going to appeal. Did he get his deal yet? Yes, he got his deal. Not at that point, but. So he had a Fifth Amendment right. He doesn't have to talk to you and tell you everything. I mean, you would say your client had a Fifth Amendment right in that situation. That's right, but he might have talked to me. We don't know that because I didn't get the opportunity. Additionally, the continuance would not have been a day. The continuance would have been from 4 o'clock on Wednesday, which was the last trial day that week, until the following Monday, which was going to be the first trial day after Wednesday. That's what the continuance would have been. It would have been a half hour, and Mendez on the stand would have taken no more than an hour. What information did you have that he would take the Fifth? At that point, I didn't have any information. Well, at the time we were arguing it, Mr. Talbert advised the judge that he had talked to Mendez's attorney. And Mendez's attorney had said that if I subpoenaed him, he would advise his client to take the Fifth. So how long a trial was this? The actual trial time was five days. Two days the first week, three days the second week, and then argument on the first day of the third week. Now, the reason I didn't subpoena Mendez prior to that time was that the government gave me notes of an interview of Mendez that had occurred in 2006. An interview where they did not write up a summary of the interview. There was no memorandum of the interview. On the first day of trial, Mr. Talbert gave me a copy of those notes. Mendez was not scheduled to testify until the second week of the trial. So we went through the first two days of trial. But you could have looked at the notes in those two days. I could have looked at the notes in those two days. And then you had a week after that that you could have subpoenaed Mendez after you got the notes. Right. When I got the notes, when I did look at the notes on Wednesday, the first line of the notes says, CS calling Mendez a lot to do drugs. I emailed immediately Mr. Talbert and said, this looks like Brady to me. Mr. Talbert emailed me back almost immediately and said, this is not Brady because the CS is not referring to Gilberto Lopez, the person we're claiming did the entrapment. It's referring to the buyer, the guy named Miguel. So it would not be Brady if it's referring to the buyer because we never, the buyer was perfectly professional. He wasn't quite that clear in that email that he sent you on March 11th. Is that the one you're talking about? Yes. He said that the agent didn't remember. He said the agent didn't remember. His notes reflect he's not talking about, the prosecutor's notes reflect that he's not talking about Gilberto Lopez. He's talking about the buyer. So there, and it says, so it's not Brady. In the argument in front of the district judge, on when I asked for the continuance, the prosecutor said that information is not Brady because he's not referring to Lopez, he's referring to the buyer. You were taking the position that the prosecutor said he didn't remember what it referred to. Well, in- Didn't you argue that at one point? Yes, in the email that you're referring to, on the 11th, I think he says, neither the agent nor I remember exactly what was said. And then he goes on to determine what was said from his notes. And so you think that's enough to just say, okay, well, I don't need to worry about that anymore. I'm not going to subpoena this witness or make any effort to send an investigator to talk to him? He's telling me that the notes are in the brief that he filed in this case. He says- I'm talking about what he was saying then. I'm not talking about- Well, he's saying the same thing. He's saying the same thing. It's not Brady. It's not Brady, so it's not going to help you. And you believed him then, but you don't believe him now? Sometimes you learn things, Judge, over time. And what I learned, I believed him until Monday of the second week, when he advised the court that they might not call Mendez as a witness. And you didn't think he had plenty of reasons other than Mendez's- Actually, Judge, I didn't know, but I thought, well, this is worth a fight. Let's ruckus it up about this. You never know what might happen. I actually thought that he had probably talked to Mendez and that what he had represented to me was correct. But he wasn't calling him, so I objected and tried to do stuff just to see what would happen. Well, all right. And I said to the judge, if I can get it. First, I said, will you make him available to me? Now, we have different recollections of what happened there. I thought, Mr. Talbert said, I will have him here tomorrow, Tuesday. Mr. Talbert says, no, he never promised that. On Tuesday- Okay, but there's another, one of the other area of objection that you take that I want to ask you about before the time is up is that the judge in the case that you've asked on several occasions that you don't want this to go back to the same judge. And that's a very high standard. What specifically can you direct me to in the record other than that the judge ruled against an evidentiary ruling on, ruled against you on issues? Why can this, why should we send this to another judge? Okay, he said on the record during sentencing that, or in response to one of the motions, that the evidence against my client was overwhelming. He said overwhelming, overwhelming. Twice. All right, but why, if that's true, why does that mean someone's not fair? He also said that it was clear to him that my client had committed perjury on the stand, obstruction of justice, and he knew exactly what was going on with respect to that. Now, he, that is saying my client's the liar, Lopez is telling the truth. That's taking that position. Mendez, from the statement we got from Mendez, Mendez would make Lopez a liar and my client the truth teller. Well, but the case was more complicated than that because your client, I mean, there are some sales that go on, I recognize that your defense was entrapment. But my understanding is that they found $20,000 of sealed money. He had, when they took him down, that he threw a lot of dope out the window of the car. He had, what, $4,000 or plus on him at that time. They had records showing that he had called his sister at home and she'd gotten rid of some guns. So, I mean, there was a, you know, it doesn't only boil down to Lopez and Mendez. Well, as to the entrapment issue, it does, Your Honor. Those are the only two people who know what transpired between the two of them. The only witness for the government on what was said to my client was Lopez. The only witness against him, Lopez, is my client. The information that Mendez would provide would be information that would corroborate my client as to what was said to him and would contradict Lopez as to his testimony and as to what he was saying to people to get them to do drug deals. This is very much, I think, like Smith versus Kane, which is a Supreme Court case dealing with the Louisiana District Attorney's office. And in which case there was only one witness identifying Mr. Smith. The DA's office withheld documents that would what the witness testified to against Mr. Smith. And Justice Roberts said, when you only have two or one witness to an event and the information contradicts that witness, that information is material and needs to be turned over to the defense. It's a Brady violation. Because- Are we talking about the district judge now or are we back to another issue? I was- You were explaining why the district judge is- I was explaining that this testimony that Mendez could offer is crucial to this case because the central issue in the case is what did Lopez tell Mr. Rodriguez? What did he do to try to convince Mr. Rodriguez to sell drugs in the first place? That was the issue in the case. And everything else happened afterwards. And the $25,000 in a sealed wrapper in the store was explained by the prior owner of the store, who sold the store to Mr. Rodriguez, that he has to keep that kind of cash available in the store in order to cash payroll checks for the field workers. You were allowed to put that evidence on, and then the prosecution also put evidence on, that people seal money like this to smuggle it over the border. So then the jury is left with two explanations of why the money would be that way. And it doesn't sound like they believed the explanation that was put on by the defense. I have a question. You're at two and a half minutes. Did you want to reserve anything for your battle? Yes, I wanted to reserve time. Okay. Good morning. Good morning, Your Honors. Phil Talbert for the United States. I was trial counsel below. And I agree that the prosecutor's job is to seek justice and a fair trial for the defendant. The record in this case shows that the defendant did receive a fair trial. Can I ask you a question about the braiding? What was your position? Was it your position that you didn't know what Mendez said, or that you didn't remember what Mendez said, or that Mendez was talking about Miguel, who was Pico, I think? My memory, which was consistent with my notes, was that he had been No, I'm not asking about now. I'm talking about when we were back in the weeds when all this was happening. What position were you taking then, that you didn't remember, or that it's not who you think it is? Your Honor, my position at the time of the trial, when defense counsel asked for the continuance and based his request for continuance in part on the claim that alleged braiding material had been withheld, my position was that my recollection, which I communicated to defense counsel in my email, was that, and consistent with my notes, was that Mendez was talking about the Pico, the buyer, confidential source, from the beginning of the interview through, and that we did not discuss Lopez, the first confidential source who introduced Pico to Mendez. Is it your position that if you did not remember, you would have had to, under Brady, go back and ask? Is that a position the government concedes, or do you think that's not the law? This Court's decision in Price makes it clear that if the government believes that the prosecution team may have exculpatory or favorable material, then the prosecutor has a duty to seek that out. Whether the prosecutor knew it at one time and forgot it, whether the prosecutor was vague on it or unsure about it. When I received Mr. Locke's email on March 11th, following the first two days of trial, that it was clear that he had interpreted Agent Ferris' notes to indicate that Mendez was referring to Lopez in that first eight-word line. We looked at the notes which we had provided to defense counsel. We had actually provided those to defense counsel for a different purpose. It was because we- I get all that. Okay, okay. So when we looked at, and my email accurately summarizes the process that we went through. The case agent was there. We were working on pre-trial or continued trial preparation. I asked the agent to look at the notes. He couldn't tell what the CS without the number referred to. What I said was I didn't recall that, meaning that I look at someone else's notes at an interview that I attended and took notes at, and I looked at his note. And it didn't mean anything to me, because that's not what I recalled. So I pulled out my own notes, and my own notes were very clear to me, which was consistent with my recollection. Which is that Mendez was talking about PICO, and how the transaction with PICO proceeded. How they first talked, and then how it was set up. Because our, when we interviewed Mendez, this was the first time that we had a chance to interview Mendez, who had not yet pled guilty or even agreed to plead guilty. This was an initial proffer session to determine whether Mendez would acknowledge his culpability as a drug trafficker, or whether he was going to go to trial and have some sort of defense. And then second, if he did admit that he was a drug trafficker, what else he knew that might be helpful to the extent that we could work out any kind of cooperation arrangement. All right, well, the continuance that the defense requested mid-trial would have only delayed the trial by a short amount of time. Wouldn't it have just been better practice to agree to the continuance to get to the bottom of the issue there? Well, Your Honor, it's not clear that it would have delayed it only for a short time. This court looks at four factors, one being the defense diligence. And at the time, based on the history with respect to Mendez, it seemed like the defense was raising something just to prolong the trial or to throw a monkey wrench in near the end of the trial. A creative ruckus, as he said? Yes, Your Honor. The second was the likelihood that the need for a continuance would have been met. This is one where, Mendez is a Spanish speaker, he was out of custody. He was living up in Marysville, Yuba City area, north of Sacramento. He was represented by Bay Area counsel, who was fairly busy trial practice. When I spoke to him after we made the decision, myself and co-counsel, that we would not call Mendez as a witness during the case. He indicated that he would recommend that Mendez, and the defense wanted Mendez as a, or was interested in Mendez as a defense witness. He indicated he would demand a proffer from defense counsel, and that he would recommend his client take the fit. So it's not clear that if Mendez had been subpoenaed, and I imagine the district court would want Mr. Lyons, Mendez's counsel, present. Which he said he was available by cell phone that next day. It's not clear whether that following Monday, Mendez would have been present, his attorney would have been there, that Mendez would have testified. If Mendez had taken the fifth, there would have had to be litigation over whether that was an appropriate claim of the Fifth Amendment, whether the cooperation agreement required the government to immunize Mendez. We would have had to decide as an office whether we thought that Mendez needed to be immunized at that time. So I'm not, it's not clear that this would have been something that would have taken a half hour or an hour at the beginning of Monday. At the same time, the district court was very careful throughout the trial to control its schedule. There were other things going on with the district court schedule. Did the government continue Mendez's sentencing hearing to prevent Mr. Locke from contacting Mendez? No, Your Honor. The government, the evidence in the record, which is the government counsel's declaration, is that there were a number of sentencing continuances for Mendez based on Mendez's counsel's request. A lot of that had to do with Mendez's counsel's schedule. A lot of the continuances had to do with the discussions between government counsel and Mendez's counsel about sentencing, about what could be argued, about what, if any, 5K motion the government would make, given that Mendez had withheld information from the government, but was still prepared to testify as part of the government's case against Rodriguez, and had earlier provided information about Rodriguez to the government. Were you aware of the defense's interest in talking to Mendez at that juncture? Well, I knew that the, at the same time that I was discussing Mendez's sentencing with Mr. Lyons, I knew that Mr. Locke was seeking to have a new trial hearing. I'd have to look back. I'm not sure whether at that time I knew that he wanted to, that he was reaching out to Mr. Lyons. I'm not sure of the timing on that. I know that at some point he made the claim that we were extending the sentencing hearing. I think that was in the, there were, on the initial new trial motion, there was the first new trial motion, and then later there was a motion to continue sentencing and for other relief that we took as kind of an addendum to the first new trial motion. And I think it was in that motion that Mr. Locke alleged that government counsel was continuing the sentencing for a nefarious purpose. Can you, several of the inquiries that we have to make, if we were to find error at any point, we would still have to assess prejudice. And Mr. Locke referred to judge, the judge's statement that the evidence was overwhelming, overwhelming. Can you explain what the evidence was? Obviously there was a jury verdict, but properly state it in terms of the inferences and what was the strength of the evidence was there if we have to get to a prejudice analysis. Yes, Your Honor. The, look at it in, in, in two respects. First is the government's case that the defendant knowingly possessed methamphetamine with the intent to distribute was overwhelming. And in fact, the defendant admitted it on the stand. So really the the issue of the overwhelming evidence goes to the government's ability to disprove the defensive entrapment. The defensive entrapment has two prongs predisposition and lack of government inducement. As the judge made clear in its, the court made clear in instructions to the jury, the government has to disprove one. The evidence in this case was overwhelming that the government was able to disprove both. First as to predisposition we had Michael Ayala who was like Mendez had already been, had already pled guilty to distributing methamphetamine in his own case and testified effectively to the jury that he had purchased methamphetamine on a series of occasions from the defendant, both at the defendant's store and in, in between, between the store and where Ayala lived. He, he described how the defendant weighed out drugs in the back kitchen area, which is the place that on the search warrant the government found the digital scale that was in a box and the box had the cell phone number of with a wrong area code of Pico and the name Miguel, which is the name the defendant knew Pico by. Also with respect to predisposition in addition to Ayala, the government had the recorded conversations including video recordings of the defendant dealing with Pico, including the audio, which indicated that where the defendant made statements indicating that he had other customers, he had people selling for him, he knew the drug lingo without Pico needing to tell him, tell him that. They distinguished between ice and Cholilo. They talked openly about whether the defendant could provide heroin to, to Pico. He asked about and, and guaranteed quality of the product. So all those things show that the defendant was in fact an experienced drug trafficker and, and in fact when the agents took the case down and the court pointed out the defendant took the police on a high speed car chase, tossed three quarter pound of very pure methamphetamine out the window, called his sister at the store. The sister was then found carrying a box with handguns, one of them a loaded .357 out the back when the police caught her. She also had packaging that had residue in it indicating that there had been drugs in a bag and had been weighed out. So all those things pointed to an overwhelming case of predisposition on the government's behalf. On the issue of lack of inducement, the the confidential source Lopez testified that the defendant showed him drugs in the back kitchen area, which is where Ayala said that the defendant had weighed out drugs and where the scale was found. And Lopez then passed the defendant's name and phone number over to Pico and the agents at that time for the the introduction. When the defendant and Pico first met, which was approximately a week later, the defendant told Pico at the introduction that he didn't have any ice. The ice had just run out. So indicating by a statement that he had just had drugs at about the time that he was there. Additionally, the defense case was largely based on phone records and the seeking to have the jury draw an inference that if Lopez was talking to Pico on the phone and Lopez was talking to Rodriguez on the phone at about the same time, that it must be that they're all talking about drugs. And Lopez denied that once the introduction was made, that he was pestering Rodriguez into selling the drugs. Well, not only did Lopez deny that he was pestering Rodriguez into selling drugs, but Pico, time and again in his own testimony, testified what their phone conversations were about. That they weren't about setting Rodriguez up to sell drugs, but they were about Lopez's concerns about his ex-wife and seeing his child and whether he was going to get his visa papers and those sorts of things unrelated to Rodriguez. So there was corroboration of Lopez's testimony about seeing drugs and then not pestering Rodriguez. All right, thank you. Let me just touch briefly on, unless the court has any more questions for me, but touch briefly on the closing argument, just to make sure that I've explained what was intended in that argument and why the government submits the district court didn't err in allowing it. The government's closing argument took the two prongs of entrapment one at a time. And when it argued inducement, first it argued, just as I did now, that Lopez's testimony that the defendant is the one who showed him the drugs. But there was testimony by the defendant that he never showed Lopez drugs, that Lopez pushed him and talked to him about selling drugs, and that he had never sold drugs before and never been involved in drugs. So my point in doing that at closing argument was to argue first that Lopez had testified that the defendant showed drugs. That was lack of government inducement. But even if you believed, as jurors, the defendant's testimony, that the defendant had never shown drugs and that it was Lopez who, over time, had pestered the defendant into selling drugs, then I ask the jurors whether that would constitute inducement. Because in this case, and it also goes to the overwhelming evidence point, it's not just that the government's evidence of lack of government inducement is overwhelming, it's relative to the defense. The defense is that a law-abiding store owner was, over time, with relatively mild pestering, talked into becoming a major drug trafficker, selling half-pound amounts of very pure methamphetamine. And that, and I asked the jury if they believed the defendant's testimony, did they really believe that the type of persuasion that the defendant testified to would have created substantial likelihood in a law-abiding individual, that the law-abiding individual would then turn to sell drugs. So with that, the government would submit it. Thank you. First, with respect to the, there are two issues in the entrapment defense. And there was not, there were no special interrogatories to the jury, so we don't know how they decided those two issues. In the Coring case, K-O-H-R-I-N-G, which was decided last year, I believe, with you, or in this circuit, it's cited in my brief, Judge Thomas discusses exactly that kind of situation and says, when you don't have special interrogatories to determine which one, then you have to assume that if there's an error as to one of those issues, one of those theories, then you have to reverse the case. Second, as to, as Mr. Talbert said, on the inducement issue, the only witness that the government has is Lopez. And the testimony by my client is, this guy worked on me for ten months, telling me that there was no risk in selling to this person because the person was a personal friend of his, and saying, look, it's like finding money on the street. My client went for ten months putting up with that and didn't sell any drugs, and then finally he gave in, and that is entrapment. And if Lopez is lying, then my client has a good case, and Mendez makes Lopez a liar. In the Smith v. Cain case, Justice Roberts said it's not up to the court to determine the credibility or what the jury's gonna think about this new witness or this new evidence, that's up to the jury. On the continuance issue, Judge Callahan, this court decided a case yesterday. United States v. Muniz, M-U-N-I-Z hyphen Jackez, J-A-Q-U-E-Z, I think. And it's similar to this, only it's a rule 16 in the midst of a trial. It becomes apparent that some information that should have been provided to the defense on their request under rule 16 was available. The prosecutor didn't know it had been available. The defense counsel asked for the information mid-trial. The judge said, no, we're not gonna do it. We're gonna complete the trial. And this court yesterday said, no, that's an abuse of discretion. You need to stop the trial and see the information before you can decide that you're not gonna allow the defense to have it. And with that, I have 16 seconds left, if anybody- You're going up. You're actually gone into overtime. Oh, I, oh, sorry. All right. No problem. Can't read. Thank you. Thank you. All right. This matter will now be submitted. Thank you for your argument. And this court will be in recess until tomorrow morning at 9 o'clock. I recognize that we will, at least in part, return. The court's going to conference at this time, and we will come back and talk to the law clerks and the students after that time. Not about these particular cases, obviously because these cases have not been decided at this point. But just general legal discussions, I guess, about judicial work. All rise.
judges: Vance, Fernandez, Callahan